[No. B139968. Second Dist., Div. Three. Nov. 15, 2001.]

GERALD MIZEL, Plaintiff and Respondent, v.
CITY OF SANTA MONICA et al, Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts A and D of the Discussion.

COUNSEL

Horvitz & Levy, Lisa Perrochet, Robert H. Wright; Lynberg & Watkins, Norman J. Watkins and Ruth Segal for Defendants and Appellants.

Law Offices of Philip M. Aidikoff and Philip M. Aidikoff for Plaintiff and Respondent.

OPINION

**ALDRICH, J.—**

## I. INTRODUCTION

Respondent and plaintiff Gerald Mizel (Mizel) slipped and fell on a unidirectional access ramp. He suffered severe and permanent injuries. He sued appellants and defendants the City of Santa Monica (the City) and Shutters on the Beach (Shutters). During trial, the trial court refused to permit defendants' undisclosed expert to testify for impeachment purposes. (Code Civ. Proc., § 2034, subd. (m).)

The matter proceeded, the jury deliberated, and thereafter rendered a verdict on special verdicts, that appeared to be inconsistent. The trial court explained to the jury what it perceived as the inconsistency and directed the jury to discuss the matter to determine if additional instruction was required. If no additional instruction was required, the court further instructed the jury to make any adjustments to the special verdicts as the jury deemed necessary. Thereafter, the jury rendered a verdict in favor of Mizel, from which defendants appeal.

In the published portions of this opinion, we conclude that the trial court's evidentiary ruling was correct. We also conclude that the trial court did not err in providing additional instruction to the jury after it first rendered the inconsistent special verdicts.[1]

---

[1] In the unpublished portions of this opinion (pts. III. A and III. D) we hold that (1) there was substantial evidence to support the jury's verdict that the unidirectional ramp and variable face curb were a dangerous condition, as distinguished from a trivial defect (Gov. Code, §§ 830, 835). In so holding we note that the parties agreed that Shutters would be liable if the City was liable, which liability depended upon the jury's conclusion, based upon conflicting evidence, that there was a dangerous condition on land; and (2) the Code of Civil Procedure section 998 offer was not in the proper form to support the award of prejudgment interest and expert fees.

## II. Factual and Procedural Background

### A. *Facts.*

#### 1. *Initial facts.*

In the early 1990's the Edward Thomas Development Company (Thomas Company) built Shutters, a beach-front hotel. The hotel was bounded by Vincent Street to the north, Pico Boulevard to the south, and Appian Way to the east. Pico Boulevard ran east/west and Appian Way ran north/south. The entrance to the hotel's motor court was off Pico Boulevard at the northwest corner of Pico Boulevard and Appian Way.

As part of the negotiations with the City, Thomas Company was required to design and construct public access improvements to the streets, curbs, sidewalks, gutters, and drainage system bordering the hotel. John B. Black (Black) was the engineer in charge of the improvement project, which required City approval.

#### 2. *The original design of the northwest curb.*

The corner of Pico Boulevard and Appian Way was part of the public way. Pursuant to Black's design, a catch basin designed to intercept storm water was constructed at the northwest corner of that intersection.[2] Two service access holes (commonly known as "manholes") were cut into the sidewalk over the catch basin.

A bidirectional handicap access ramp in a symmetrical fan shape was also built at the corner. The sides of the fan angled up on both sides and met the sidewalk.

#### 3. *The redesign of the corner.*

In 1993, William Jordan (Jordan) was hired as an access consultant to provide services to Shutters and the City. Jordan was to determine if the improvements complied with governmental requirements governing access for the disabled. Jordan inspected the ramp. He concluded the bidirectional ramp was very dangerous because it was *too steep* for handicap access and did not have a landing area at the top of the ramp. The steep angle of the flared curb resulted from its proximity to the catch basin. Without moving the catch basin, it was impossible to build an access ramp in an east-west

---

[2] A catch basin is a gutter carved out of a curb designed to collect water that flows downhill during a rainstorm.

direction along Pico Boulevard with a slope sufficiently gentle to meet regulations. Jordan suggested the curb be reconstructed to lower the pitch. Jordan's evaluation was given to the City and to Thomas Company.

Thomas Company did not want to move the catch basin. To eliminate the steep pitch of the existing ramp, Jordan recommended a unidirectional access ramp. Unidirectional ramps offer ramp access to the sidewalk heading in one direction, while creating a variable face curb abutting the sidewalk on the other side. A variable face curb is taller on one side and then tapers down. The proposed unidirectional ramp would provide handicap access to the sidewalk and the hotel along Appian Way, but not along Pico Boulevard.

Jordan also recommended blocking the resulting variable face curb with large planters to be placed on the sidewalk. Jordan believed the planters were necessary because the variable face curb would cause some pedestrians to trip. Jordan believed the planters would prevent the tripping hazard and prevent mixing pedestrians with vehicular traffic. If planters were in place, that portion of the sidewalk would not be useable for pedestrians. Pedestrians would gain access to the hotel through the courtyard.

Black objected to Jordan's design. In a July 1993 letter to the City, Black acknowledged the tripping hazard to be created by the variable face curb, but he disagreed with the suggestion that planters be placed on the sidewalk. Black was concerned that the planters would force pedestrians into the street. No one responded to Black's letter.

4. *Construction of the unidirectional ramp.*

The unidirectional ramp including the variable face curb was built by the Thomas Company. However, *no* planters were placed on the sidewalk. The variable face curb was approximately eight inches high at the point adjacent to the street; it tapered to nothing on the side farthest from the street. The variable face curb was painted yellow and stenciled with a warning. The City signed off on the project, signifying its satisfaction with the improvements. Shutters received a certificate of occupancy.

5. *The accident.*

On the evening of March 29, 1997, Mizel, a 70-year-old British citizen, was visiting Southern California for the first time. He and his wife, Sylvia, ate dinner at a restaurant in Venice with two friends, Richard and Daphne Ziman. Mizel had one glass of wine. After dinner, the four drove to the beach intending to have dessert at Shutters.

At approximately 10:30 p.m., the four friends walked west along Pico Boulevard toward Shutters. The two women walked in front of the two men. Mizel strolled down the street with Richard Ziman, chatting. Mizel was on the left side of Richard Ziman. It was dark. As the two men approached the corner of Pico Boulevard and Appian Way, Mizel's attention was directed forward and downward. Mizel tripped on the variable face curb. Mizel struggled to keep his balance, but his momentum carried him forward. His left arm and face smashed into the side of a car near the entrance to Shutters.

6. *Mizel's injuries.*

Mizel was taken by ambulance to the hospital. He was admitted at approximately 11:00 p.m. Mizel was examined by the orthopedic surgeon on call, Dr. Walter O'Brien. Dr. O'Brien noted that Mizel was drowsy and smelled of alcohol. Mizel had a very severe fracture dislocation of the left shoulder. The ball in Mizel's shoulder joint was fractured in multiple pieces. In addition, muscles and tendons in Mizel's shoulder had been shredded, severely damaging Mizel's rotator cuff tendon. The nerves that extended from the spinal cord through the shoulder to Mizel's left arm were permanently damaged.

Three days later, Dr. O'Brien operated on Mizel. Because the bone was broken in so many places, it could not be repaired. The ball portion of Mizel's left shoulder was replaced with a titanium prosthetic. Mizel was hospitalized for three weeks in the United States and at least one week in the United Kingdom. The rotator cuff damage and the nerve damage could not be remedied by surgery or physical therapy. Mizel suffered permanent damage resulting in immobility to his left arm and shoulder, was in constant pain, and became depressed. He needed assistance to do minor tasks, such as dressing. His condition was expected to deteriorate over time.

B. *Procedure.*

Mizel filed a complaint against Shutters and the City. The matter proceeded to trial.

Upon special verdicts, the jury found the following: the curb was a dangerous condition that was the cause of Mizel's accident; Shutters was 30 percent liable, the City was 65 percent liable, and Mizel was 5 percent liable; economic damages totaled $856,712; and noneconomic damages totaled $3 million.

After a motion to tax costs, judgment was entered for Mizel and against the City and Shutters in the sum of $3,663,876.40, plus costs.[3]

The City and Shutters appealed from the judgment.

### III. DISCUSSION

**A. *As a matter of law, the curb was not a "trivial defect."****

. . . . . . . . . . [¶] . . . . . . . . . . . . . . .

**B. *The trial court did not err in excluding the testimony of defendants' rebuttal expert witness.***

 Defendants contend reversal is warranted because the trial court precluded the testimony of their expert. We conclude that this contention is unpersuasive.

#### 1. *Additional facts.*

Mizel presented the testimony of Dr. O'Brien, the orthopedic surgeon. In cross-examination, Dr. O'Brien testified that he and emergency room medical personnel made the following note in Mizel's medical records: "strong smell of ETOH." This indicated that upon admission, Mizel had a strong smell of alcohol. Defendants' counsel asked Dr. O'Brien a series of questions relating to how much a person would have to drink in order to smell of alcohol. The questions were framed to elicit responses *based upon Dr. O'Brien's medical school training*. Dr. O'Brien rejected the suggestion that just because someone smelled of alcohol, that person had to have drunk a significant amount of alcohol. Dr. O'Brien testified that "[o]nce you develop a smell for alcohol, . . . you have a very keen smell, and you can smell it very easily. [¶] . . . [¶] Well, the alcohol was potentially a significant—at that point we're just gathering data and possibly contemplating emergency surgery, and so we gather every bit of data that we can. And at that point in time it was simply an observation that there was a smell of alcohol." Dr. O'Brien further testified it was "absolutely false" that he was aware of published studies concluding "that the smell of alcohol can't be reliably detected until you are approaching [blood-alcohol level] .08?" Rather, O'Brien testified, "I *am aware of my own experience*, and after you spend as many hours in the emergency room as I have, *throughout my training*, and

---

[3]Five percent of $3,856,712 = $192,835.60.
$3,856,712 − 192,835.60 = $3,663,876.40.
*See footnote, *ante*, page 1059.

after you have treated as [many] people as I have, who have consumed various levels of alcohol, you realize that the study may not always be correct, whatever study you are referring to. And I have a very keen sense of smell, especially for alcohol." (Italics added.) He additionally testified that even if someone else in the emergency room also smelled alcohol, such a "keen sense of smell" was common in emergency personnel. "[We're very sensitive to whether a patient has been drinking because] in life-saving measures or [when we are] contemplating anesthesia, we don't know if we're going to have to immediately take him to surgery at that point. And so the presence of alcohol would be important for the anesthesiologist to note . . . ."

Defendants sought to call Dr. Stewart Moskowitz who had conducted studies relating to the consumption of alcohol. Dr. Moskowitz had *not* been designated as an expert. Defendants indicated they wished to call Dr. Moskowitz pursuant to Code of Civil Procedure section 2034, subdivision (m) to impeach Dr. O'Brien's testimony. According to defendants, Dr. Moskowitz would demonstrate the falsity of a matter upon which Dr. O'Brien had based his opinion. Dr. Moskowitz was to be asked, based upon his "training, research, and studies, everything else," "if he has an opinion about whether *there is a level below which alcohol is not normally detectable through the sense of smell.*" This would include his "experience with experienced professionals in the field . . . that they can only reliably detect the presence of alcohol through the sense of smell, when a consumption level is in the range of .08."

The trial court excluded Dr. Moskowitz's testimony on the ground that it was "in effect . . . an expression of opinion, and . . . does not qualify under the exception of [Code of Civil Procedure section] 2034(m)."

### 2. *Discussion.*

■ "Under Code of Civil Procedure section 2034, subdivision (m), an undisclosed expert witness called for impeachment purposes is permitted to testify that a foundational fact relied upon by a prior expert is either incorrect or nonexistent. [Citation.]" (*Howard Contracting, Inc. v. G. A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 53 [83 Cal.Rptr.2d 590].) "This can be done either by cross-examination of the expert or by calling other witnesses to offer evidence showing the nonexistence or error in the data upon which the first expert based his opinion. [Citations.]" (*Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 923 [184 Cal.Rptr. 393].) Thus, a nondesignated expert may testify as to the *facts* underlying the expert's opinion. (*Id.* at pp. 923-924.) "However, under section 2034, subdivision (m), ' "calling an expert witness to express an

opinion contrary to that expressed by another expert witness is not the 'impeachment' contemplated by section [2034, subdivision (m)]." ' [Citation.]" (*Howard Contracting, Inc. v. G. A. MacDonald Construction Co., supra,* at pp. 53-54.)[4] Although the distinction between a "fact" and "opinion" may be thin, it has to be made. In doing so, trial courts are to strictly construe the term "foundational fact" so as to "prevent a party from offering a contrary opinion of his expert under the guise of impeachment." (*Kennemur v. State of California, supra,* at p. 924.)

■ Here, Dr. Moskowitz was expected to render a contrary opinion, not, as defendants suggest, to contradict the underlying factual foundation of Dr. O'Brien's testimony. Rather, Dr. Moskowitz was to testify, based upon his training, research, and studies, including his experience with professionals in the field, that alcohol can only be detected through smell when there has been consumption to a blood-alcohol level in the range of .08. This testimony would not challenge the foundational facts of Dr. O'Brien's testimony, which were based upon his personal education and experience. (*Fish v. Guevara* (1993) 12 Cal.App.4th 142, 145-146 [15 Cal.Rptr.2d 329]; compare with *Stark v. City of Los Angeles* (1985) 168 Cal.App.3d 276, 287-288 [214 Cal.Rptr. 216] [undisclosed expert properly permitted to testify as to siren's audibility range].)[5] The trial court did not err in excluding Dr. Moskowitz's testimony.

### C. *The trial court did not err in ordering further deliberations.*

After the jury first rendered a verdict upon special verdicts, the jury was directed by the court to deliberate further. Defendants contend the trial court erred in ordering additional deliberations. Defendants also contend the trial court erred by coercing a result and in instructing the jury as to the effect of the special verdicts. We conclude that these contentions are unpersuasive.

### 1. *Additional facts.*

The jury was provided special verdicts. The jury deliberated for five hours.

The jury found Shutters was negligent, the negligence was a cause of Mizel's injuries, the property in question, i.e., the unidirectional ramp and

---

[4]Code of Civil Procedure section 2034, subdivision (m) provides in part: "A party may call as a witness at trial an expert not previously designated by that party if . . . that expert is called as a witness to impeach the testimony of an expert witness offered by any other party at the trial. This impeachment may include testimony to the falsity or nonexistence of any fact used as the foundation for any opinion by any . . . expert witness, but may not include testimony that contradicts the opinion."

[5]*Stark v. City of Los Angeles, supra,* 168 Cal.App.3d 276, was superseded by statute as stated in *Thomas v. City of Richmond* (1995) 9 Cal.4th 1154, 1161-1162 [40 Cal.Rptr.2d 442, 892 P.2d 1185].

variable face curb, was a dangerous condition, and the dangerous condition was a cause of Mizel's injuries.[6] The jury then found, in response to question No. 5, that the dangerous condition did *not* create a foreseeable risk of the kind of injury which incurred.[7] The jury also apportioned liability, finding Mizel was 5 percent at fault, Shutters was 30 percent at fault, and the City was 65 percent at fault. These percentages were ascertained in response to question No. 11, which read: "Assuming that a hundred percent represents the total negligence and wrongful conduct which was the cause of [Mizel's] injuries or damage, what percentage of this hundred percent is due to the contributory negligence of [Mizel] and what percentage of the hundred percent is due to the negligence and wrongful conduct of the defendant?" The jury found economic damages of $856,712 and noneconomic damages of $3 million.

Outside the presence of the jury, the trial court commented to counsel that the special verdicts were perplexing because the jury's response to question No. 5 "means there is no liability on the part of the defendants," yet other responses indicated defendants were liable. The trial court foresaw two possibilities—first, there might have been a typographical error, "[o]r alternatively, they may have had a . . . conceptual misunderstanding . . . which means that the . . . verdict, if it was written correctly, it's improper, and something has to be done." Counsel agreed with the court's suggestion that the problem should be explained to the jury and the jury would be requested to decide, in the privacy of the jury room, if the problem could easily be corrected or if further instructions were required.

The trial court explained to the jury what the court perceived as the inconsistency. The court pointed to the special verdicts, stating in part, "[I]f you look at the way in which you answered the last question, you broke down your various percentages of allocation, and you assigned an allocation of fault to the City of Santa Monica, which is inconsistent with your answer to question number 5. Because in question number 5 you found by vote of nine to three, that the dangerous condition created—did not create a reasonable [*sic*] foreseeable risk of the kind of injury which arose in this action . . . . [¶] So this is my request. I want you to do two things: [¶] First, . . . I want the jury to go back to the jury room and discuss this issue further. If

---

[6]The jury answered "yes" to the following special verdicts:

"Was the defendant *Shutters On The Beach Hotel* negligent?"

"Was such negligence a cause of injury or damage to [Mizel]?"

"As to Defendant City of Santa Monica, was the public property in question in a dangerous condition at the time of the accident in question?"

"Was a dangerous condition of the public property a cause of injury to [Mizel]?"

[7]The jury answered "no" to question No. 5: "Did the dangerous condition create a reasonable [*sic*], foreseeable risk of the kind of injury which was incurred?"

the jury cannot discuss the matter further without asking a question of the court, explain to me what it is that you told me I did wrong, then frame the question and send the question to me through the bailiff. And then I will help you focus on what it is that is the problem with the jury verdict form. [¶] If, on the other hand, as you go through the jury verdict form you feel that privately amongst yourselves, you can arrive at an adjustment to it which reflects your true . . . analysis and vote, then adjust the verdict form, change the numbers to make whatever changes you think have to be made in order to bring it into alignment with whatever your thinking is, and then return the verdict to the bailiff." The foreperson informed the court that he believed the jury could solve the problem. The jury retired to the jury room.

While the jury was in the jury room, defendants' counsel stated that after consulting cocounsel, "[W]e believe that for the jury to go back and try and correct it now is inappropriate, and that they have rendered a verdict, inconsistent though it is, and that a mistrial would be appropriate." The trial court denied the motion for mistrial.

The jury entered the courtroom five minutes later. In response to the court's inquiry, the foreperson stated that the jury had not inadvertently transposed the numbers in answering question No. 5, but originally had misunderstood question No. 5. A new verdict form was handed to the court. It had all of the same responses, except for the following. Question No. 5 was answered "yes" (the dangerous condition created a reasonably foresee-able risk)[8] and questions Nos. 6 and 7, that previously had been unanswered, had been answered (the dangerous condition of the property was created by a negligent act or omission of the defendant's employee, and the defendant had notice of the dangerous condition in sufficient time to take corrective measures).[9] Defendants renewed their motion for mistrial, which was denied. The foreperson informed the court that the jury had answered questions Nos. 6 and 7 because the answer to question No. 5 had been changed. The jury was polled, confirming the votes.

## 2. *Discussion.*

 When a jury renders an informal or insufficient verdict not covering the issue submitted, the trial court may direct the jury to deliberate further, to

---

[8]See footnote 7, *ante*.

[9]Question 6 read: "Was the dangerous condition of the property created by a negligent or wrongful act or omission of an employee of the defendant, acting within the scope of employment?"

Question 7 read: "Did the defendant have actual or constructive notice of the dangerous condition a sufficient time prior to the accident within which measures could have been taken to protect against the dangerous condition?"

correct any ambiguity. (Code Civ. Proc., § 619;[10] *Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287, 302 [96 Cal.Rptr.2d 605]; *Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, 1603-1604 [28 Cal.Rptr.2d 62]; *Fernandez v. Consolidated Fisheries, Inc.* (1953) 117 Cal.App.2d 254, 263 [255 P.2d 863] [if judge has doubts as to whether the verdict is ambiguous, judge may send jury out, under proper instructions, to correct the verdict]; *Mish v. Brockus* (1950) 97 Cal.App.2d 770 [218 P.2d 849].) In so doing, the court may not direct the jury's deliberations. Trial courts may not throw their weight of influence "into the deliberations of the jury as to matters exclusively within its province." (*Crowe v. Sacks* (1955) 44 Cal.2d 590, 598 [283 P.2d 689].)

 Here, the jury originally returned ambiguous and inconsistent verdicts: some responses indicated the curb was a dangerous condition that caused Mizel's injuries amounting to almost $4 million, but the response to question No. 5 was that the dangerous curb had *not* created a reasonably foreseeable risk of the kind of injury suffered by Mizel. Given this confusion, the trial court did not err in providing additional instruction and requesting the jury to deliberate further.

Defendants argue that the situation before the trial court did not fall within the ambit of Code of Civil Procedure section 619 and thus the trial court erred in directing the jury to deliberate further. Defendants assert that here the verdict was "inconsistent" and Code of Civil Procedure section 619 grants trial courts the authority to further instruct the jury only if "informal" and "insufficient" verdicts are rendered. (See fn. 10, *ante*, and *Crowe v. Sacks, supra,* 44 Cal.2d at p. 596, defining the terms.) As defendants note, trial courts may not reinstruct in all circumstances. For example, reinstruction is not warranted if a verdict is "erroneous." (E.g., *Clark Equipment Co. v. Mastelotto, Inc.* (1978) 87 Cal.App.3d 88, 98-100 [150 Cal.Rptr. 797] [trial court cannot direct further deliberations simply because court concludes the damage award was inadequate].)

However, contrary to defendants' argument, reinstruction has been approved in situations similar to the one before us. (E.g., *Mendoza v. Club Car, Inc., supra,* 81 Cal.App.4th 287 [jury properly reinstructed after jury returns verdict stating there was a defect causing harm to plaintiff, but also a verdict stating plaintiff's injuries were not reasonably foreseeable and jury apportions fault]; *Sherwood v. Rossini* (1968) 264 Cal.App.2d 926 [71 Cal.Rptr. 1] [judge properly explained to jury that verdict did not comport with instructions and directed renewed deliberations]; *Mish v. Brockus, supra,* 97

---

[10]Code of Civil Procedure section 619 states, "When the verdict is announced, if it is informal or insufficient, in not covering the issue submitted, it may be corrected by the jury under the advice of the Court, or the jury may be again sent out."

Cal.App.2d at p. 776 [when verdicts are insufficient, contradictory, and incomprehensible, court has duty to proceed under Code Civ. Proc., § 619]; *Bisnett v. Hollis* (1962) 207 Cal.App.2d 142 [24 Cal.Rptr. 231] [judgment reversed when verdict was confusing and trial court had not reinstructed]; *Johnson v. Marquis* (1949) 93 Cal.App.2d 341, 355 [209 P.2d 63].)

Defendants cite to *Cavallaro v. Michelin Tire Corp.* (1979) 96 Cal.App.3d 95 [157 Cal.Rptr. 602] and *Campbell v. Zokelt* (1969) 272 Cal.App.2d 315 [77 Cal.Rptr. 561] to further their argument that an "inconsistent" verdict is not an "informal or insufficient" verdict. However, these cases discuss Code of Civil Procedure section 619 in the context of whether there was a waiver. These cases should not be read to limit the trial court's ability to reinstruct the jury in a neutral manner after the jury renders inconsistent verdicts. (Cf. Code Civ. Proc., § 128.)

In a trial, the court, the parties and the jury have invested time and energy towards the goal of providing the parties with a fair trial and a result based upon the jury's accurate understanding of the law. If the jury renders an inconsistent or ambiguous verdict, it is prudent, economical, and judicious to provide that jury with an opportunity to correct those inconsistencies before it is discharged.

The essence of defendants' argument is that it is improper for the trial court to direct further deliberations when responses to special verdicts are inconsistent. This would result in a needless waste of judicial resources in many easily rectifiable situations. Adoption of defendants' argument would force parties to retry cases, at an unnecessary cost to them, when a simple clarification by the trial court could resolve the confusion. Defendants' proposal would deprive the jury of the opportunity of clarifying its position and in rendering a verdict consistent with its intent. Hence, it is appropriate for trial courts to reinstruct the jury in an objective, neutral, and noncoercive manner if a jury's simple misunderstanding as to the verdict forms, or a clerical error, can be corrected. (E.g., *Mendoza v. Club Car, Inc., supra,* 81 Cal.App.4th 287.) In such situations trial courts are warranted in ascertaining if further instruction would assist the jury in correcting a conceptual misunderstanding, and in providing such instruction if the jury so requests. These simple actions by the trial court are a proper exercise of its power. (Code Civ. Proc., § 619.)

██ Nor did the trial court here coerce the verdict, as defendants contend. Rather, in discussing the discrepancy in the verdicts, the trial court carefully avoided directing the jury's decision. The trial court simply pointed out what appeared to the court and the parties as unclear special verdict responses.

The trial court provided neutral direction to the jury. The trial court's additional directives did not assume the jury intended one result or another. The trial court did not, by its statements, lead the jury to a particular answer. All decisionmaking was left to the jury. The court did not interfere with the jury's prerogative. (Compare with *Crowe v. Sacks, supra,* 44 Cal.2d 590.) Rather, it merely provided the jury with an opportunity to render a verdict in accordance with its deliberations.

We further find unpersuasive defendants' contention that reversal is required because the trial court instructed the jury as to the effect of the special verdicts. By this contention, defendants mischaracterize the trial court's actions. Further, if the trial court did so instruct, there is no error as the court was acting to provide the jury with an opportunity to correct the inconsistent special verdicts. (*Mendoza v. Club Car, Inc., supra,* 81 Cal.App.4th at pp. 307-309.)

The trial court did not err in instructing the jury to deliberate further.

D. *The trial court erred in awarding interest and expert fees based upon Mizel's unapportioned Code of Civil Procedure section 998 offer.*\*

. . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The award to Mizel for $22,507 in expert fees and $77,135.98 in prejudgment interest is stricken from the judgment. Other than striking the award for expert fees and prejudgment interest, the judgment is affirmed. The parties are to bear their own costs on appeal.

Klein, P. J., and Kitching, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 13, 2002.

---

\*See footnote, *ante,* page 1059.